(March 23, 1915.)

## SARAH D. BOWER and J. E. BOWER, Her Husband, Respondents, v. D. B. MOORMAN, AGNES E. PARKS and JAMES COCHRAN, Appellants.

[147 Pac. 496.]

PARTIES INTERESTED — TITLE OF ACTIONS — CONFLICTING EVIDENCE — SUBTERRANEAN WATERS — APPROPRIATION — INTERFERENCE—DIVERSION—ACTUAL PERMANENT DAMAGE—INJUNCTIVE RELIEF—FINDINGS OF FACT—INSUFFICIENT—CAUSE REMANDED.

1.   Where it appears that the respondents are the owners in fee of the land upon which artesian wells are located and retain the right to the control and management of water flowing from said wells to the place of distribution, and where it further appears that said respondents are the owners of virtually all of the capital stock of a private corporation to which the right to the use of said waters has been conveyed by deed, a motion for a nonsuit in an action by them to enjoin interference with the flow of water from said wells on the ground that they are not parties in interest will not be entertained.

2.   Where there is a substantial conflict in the evidence, the findings of the court will not be disturbed.

3.   Sec. 3242, Rev. Codes, provides: "The right to the use of waters of rivers, streams, lakes, springs and subterranean waters may be acquired by appropriation."

4.   As between appropriators of subterranean waters, the first in time is the first in right.

5.   Where subterranean water exists in a state of nature throughout a tract of land the ownership of which is held in different proprietors, it would seem to be impossible to adopt a rule giving each proprietor the absolute right to withdraw all of the subterranean waters from his tract of land, and thus destroy the benefits made possible by the proper regulation of subterranean waters.   And an injunction will issue to restrain any permanent interference by an adjoining land owner with the right to the use of subterranean water acquired by a prior appropriator.

6.   Before a permanent injunction should issue in a case of this character, the evidence should clearly and conclusively establish that the real cause of the loss of water flowing from the well of a

prior appropriator of subterranean water is the construction of the well of a junior appropriator of said subterranean water.

7. If the sinking of M.'s well to the depth that B.'s large well has been sunk, or to a greater depth, would not interfere with the flow of the water in B.'s well, or if there was a loss of water in B.'s well occasioned by the sinking of M.'s well, which, in like quantity, could be returned to B.'s well without material damage, and at the same time water secured in M.'s well, the court would not be justified in issuing a permanent injunction preventing the completion of M.'s well.

8. Should it become necessary to change the method or means of diverting water by a prior appropriator of subterranean waters, that, in and of itself, should not deprive a subsequent appropriator from acquiring unappropriated subterranean water, unless it further appeared that it would be impossible to deliver said water to the diverting works of the prior appropriator.

9. Although it may be found that in the sinking of a well by a land owner direct communication was made with the same artesian belt or basin tapped by an adjoining land owner, who was a prior appropriator of subterranean water, the court would not be justified in issuing a perpetual injunction prohibiting the completion of the well of a junior appropriator of subterranean waters, unless it further conclusively appeared that the prior appropriator would suffer permanent loss of water by reason of the tapping of said artesian belt or basin.

10. The fact that the sinking of a well would endanger the supply of water flowing from a well on adjoining land owned by a prior appropriator of subterranean waters, would not justify the issuance of a permanent injunction, unless it were conclusively shown that the water supply of the first appropriator would be actually and permanently diminished.

11. If, in the sinking of a well, the flow from a well of an adjoining land owner and prior appropriator of subterranean water is lessened, before a permanent injunction should issue, it must be conclusively established that the water so lost cannot be returned from the well of the subsequent appropriator to the diversion works of the prior appropriator.

12. *Held*, that the findings of fact are not sufficient to support the judgment, and it is accordingly ordered that the case be remanded to the district court with directions to suspend the injunction, permitting appellants to continue the construction of the well on said lot 5, until it is established that by reason of the sinking of appellants' well the respondents' well will sustain a material and permanent loss of water supply; and if it shall later appear to the

satisfaction of the district court that said actual loss of water has been sustained in respondents' well due to the construction of appellants' well, and such water cannot be returned to the diversion works of respondents, said injunction should be reinstated, permanently closing the well of appellants.

APPEAL from the District Court of the Fourth Judicial District, Twin Falls County. Hon. C. O. Stockslager, Judge.

Action to perpetually restrain the construction of artesian well. Judgment for plaintiff. *Modified.*

A. M. Bowen and George Herriott, for Appellants.

Land owners whose lands overlie the same artesian basin have coextensive rights to water from such artesian basin, and one land owner cannot convey such water outside the basin for sale or use to the injury of another land owner in the same basin. (*Katz v. Walkinshaw,* 141 Cal. 116, 99 Am. St. 35, 70 Pac. 663, 74 Pac. 766, 64 L. R. A. 236; 2 Wiel on Water Rights, 3d ed., p. 974, and cases cited.)

Digging a well upon one's own land to obtain water to irrigate his land within the artesian basin is a reasonable use of his land, and is lawful, even though such well may deprive another land owner within the basin of a certain amount of water. (I Wiel, 3d ed., p. 812, and cases cited; 2 Wiel, 3d ed., p. 1067, sec. 1140.)

The appropriation doctrine as to surface streams commonly called the "Colorado Doctrine" and such as we have in this state does not apply to percolating waters. (2 Wiel, 3d ed., p. 1040.)

"The spirit of the new law of percolating water, as well as the rulings under it, make directly against the law of exclusive rights by priority of appropriation." (*Sullivan v. Northern Spy Min. Co.,* 11 Utah, 438, 40 Pac. 709, 30 L. R. A. 186; 2 Wiel, 3d ed., p. 1045, sec. 1106, and cases cited.)

The law relative to percolating water in the soil, whether diffused or tributary to wells or springs or artesian supply, is separate and distinct from the law of appropriation. In some of the arid states, recognizing priority of appropriation

it is held that the common law prevails as to percolating water, and the owner of the soil has absolute control of percolating water in the soil even though its use may dry up the well of another. (*Sullivan v. Northern Spy Min. Co., supra; Southern Pacific Ry. Co. v. Dufour,* 95 Cal. 615, 30 Pac. 783, 19 L. R. A. 92; *Mosier v. Caldwell,* 7 Nev. 363; *Crescent M. Co. v. Silver King M. Co.,* 17 Utah, 444, 70 Am. St. 810, 54 Pac. 244; *Willow Cr. Irr. Co. v. Michaelson,* 21 Utah, 248, 81 Am. St. 687, 60 Pac. 943, 51 L. R. A. 280. See notes, 30 L. R. A. 186; 9 L. R. A. 92; 21 L. R. A., N. S., 76.)

In other states the common law has been modified by allowing the owner of land containing percolating water feeding springs, wells or artesian basins the right only to a reasonable use of such water. This rule is the one now generally recognized. (*Pence v. Carney,* 58 W. Va. 296, 112 Am. St. 963, 52 S. E. 702, 6 L. R. A., N. S., 266; *Cohen v. La Canada L. & W. Co.,* 142 Cal. 437, 76 Pac. 47; *Stillwater Water Co. v. Farmer,* 89 Minn. 58, 99 Am. St. 541, 93 N. W. 907, 60 L. R. A. 875; *Barclay v. Abraham,* 121 Iowa, 619, 100 Am. St. 365, 96 N. W. 1080, 64 L. R. A. 255.)

So far as we are aware, it has never been held anywhere that percolating water in the soil is anything but a part of the soil itself, and not subject to appropriation. Some courts limit the land owner's right to a reasonable use, others allow him correlative rights, and others give him absolute control, but always he has the right to some use thereof. (*Willow Cr. Irr. Co. v. Michaelson, supra; Howard v. Perrin,* 8 Ariz. 347, 76 Pac. 460; *Crescent Min. Co. v. Silver King Min. Co.,* 17 Utah, 444, 70 Am. St. 810, 54 Pac. 244; *Katz v. Walkinshaw, supra; City of Emporia v. Soden,* 25 Kan. 588, 37 Am. Rep. 265; *Boyce v. Cupper,* 37 Or. 256, 61 Pac. 642; *Case v. Hoffman,* 100 Wis. 314, 72 N. W. 390, 74 N. W. 220, 75 N. W. 945, 44 L. R. A. 728; *Mosier v. Caldwell,* 7 Nev. 363.)

Under the constitution and statutes of Idaho, the only waters subject to appropriation are public waters. This consists of waters flowing in their natural channels, springs and lakes. The term "subterranean waters" as used in sec. 3242 must therefore refer to such underground bodies or streams

as would be considered public waters. (Const., art. 15; Rev. Codes, secs. 3240, 3253, 3268; *Walbridge v. Robinson,* 22 Ida. 236, 125 Pac. 812, 43 L. R. A., N. S., 240.)

The only waters to which the legislature could grant the right of appropriation would be public waters; any interference with private waters would be a violation of the rights of private property. (*King v. Chamberlin,* 20 Ida. 504, 118 Pac. 1099; Wiel on Water Rights, sec. 233.)

The burden of proof as to the existence of an underground stream is on him who asserts the same. In the absence of a showing the presumption is that underground water is percolating water. (2 Kinney on Irrigation, p. 2116, and cases cited; *Barclay v. Abraham, supra; Case v. Hoffman, supra; Mosier v. Caldwell, supra.*)

Even though plaintiff has a right to the water of the artesian flow already tapped or threatened to be tapped by defendant, defendant would be entitled to any surplus, and also entitled to same when not used by plaintiffs. (*Smith v. Hawkins,* 120 Cal. 86, 52 Pac. 139; *Salt Lake City v. Salt Lake City Water etc. Power Co.,* 24 Utah, 249, 67 Pac. 672, 61 L. R. A. 648; *Mann v. Parker,* 48 Or. 321, 86 Pac. 598; *Saint v. Guerrerio,* 17 Colo. 448, 31 Am. St. 320, 30 Pac. 335; *Hutchinson v. Watson Slough Ditch Co.,* 16 Ida. 484, 133 Am. St. 125, 101 Pac. 1059; *Burr v. MacClay R. W. Co.,* 154 Cal. 428, 98 Pac. 260.)

Even though defendants should tap and divert water from the same source as plaintiff, defendant would be entitled to all over the amount to which plaintiff may be entitled, or which he would use. If the amount were found inadequate, a court could require the temporary or permanent closing of defendant's well. The injury would be reparable, and there is no equity, otherwise arising warranting an injunction. As a general rule, an injunction will not lie where any injury is reparable. (22 Cyc. 762; also 929; *California Nev. Co. v. Union Transp. Co.,* 122 Cal. 641, 55 Pac. 591; *State Bank v. Rohren,* 55 Neb. 223, 75 N. W. 543; *Thorn v. Sweeney,* 12 Nev. 251; *Portland v. Baker,* 8 Or. 356; *Leitham v. Cusick,* 1 Utah, 242.)

The plaintiffs cannot deprive defendant of the right to bore and prospect for water on the theory that they will be deprived of the use of the tank, for even if plaintiffs have prior rights to the water, which has or may hereafter be tapped by defendants, the actual flow to which they are entitled is the only thing a court of equity will protect by injunction. (Kinney on Irr., sec. 724, p. 1247; *Salt Lake v. Gardner* (Utah), 114 Pac. 147; *Schodde v. Land & Water Co.*, 224 U. S. 107, 32 Sup. Ct. 470, 56 L. ed. 686; S. C., 161 Fed. 43, 88 C. C. A. 207.)

The plaintiffs were awarded an injunction upon an apprehended injury which was merely a guess or a possibility. To warrant a permanent injunction there must be reasonable grounds for apprehending actual injury and a showing that there is reasonable probability the injury will occur. (*Boise Dev. Co. v. Idaho Trust etc. Bank*, 24 Ida. 36, 133 Pac. 916; *Lorenz v. Waldron*, 96 Cal. 243, 31 Pac. 54; *Genet v. Delaware & H. Canal Co.*, 122 N. Y. 505, 25 N. E. 922; *Hurd v. Atchison etc. Ry. Co.*, 73 Kan. 83, 84 Pac. 553; *Lester Real Estate Co. v. St. Louis*, 169 Mo. 227, 69 S. W. 300; *Bigelow v. Bridge Co.*, 14 Conn. 565, 36 Am. Dec. 502; 22 Cyc. 758, and cases cited.)

Even in cases of temporary injunction, it should not be granted upon a mere possibility of injury. (*Montana O. P. Co. v. Boston & M. Con. C. & S. Min. Co.*, 22 Mont. 159, 56 Pac. 120.)

To authorize an injunction, violation of plaintiff's rights must be of such a nature as is, or will be, attended with substantial or serious damage. (*Stauffer v. Cincinnati etc. R. Co.*, 33 Ind. App. 356, 70 N. E. 543; *Steffes v. Moran*, 68 Mich. 291, 36 N. W. 76; *Tanner v. Nelson*, 25 Utah, 226, 70 Pac. 984; *Jacob v. Day*, 111 Cal. 571, 44 Pac. 243; *Hall v. Rood*, 40 Mich. 46, 29 Am. Rep. 528.)

Plaintiffs have no actual interest in the Bower well, the entire flow having been deeded to the Artesian City corporation. This being true, injunctive relief should not have been awarded. (2 Kinney on Irrigation, p. 2907.)

The return of the water so that they can apply same to the same beneficial use is all the plaintiffs could ask, even though water was tapped by defendants. (*Chandler v. Austin,* 4 Ariz. 346, 42 Pac. 483.)

J. C. Rogers, C. O. Longley and W. P. Guthrie, for Respondents.

California had not provided by statute for the appropriation of subterranean water at all at the time the decisions cited by appellant were made. The same seems to be true with regard to the other states, whose decisions have been quoted in appellant's brief and reviewed by Mr. Wiel in his work on Water Rights in the Western States. But this array of authorities is all swept away by the positive statute law of this state, which provides for the appropriation of subterranean water in the same way and manner that surface streams are appropriated, and the effect of the appropriation is also declared to be the same, that is, the first in time is first in right. (Sec. 3242, Rev. Codes.)

This court held in *Le Quime v. Chambers,* 15 Ida. 405, 98 Pac. 415, 21 L. R. A., N. S., 76, "that even percolating water is subject to appropriation under our statutes."

The supreme court of California in *Vineland Irr. Dist. v. Azusa Irr. Co.,* 126 Cal. 486, 58 Pac. 1057, 46 L. R. A. 820, defines percolating water to be "wandering drops moving by gravity in any and every direction along the line of the least resistance."

Any person may sue for an interference with the possession or property if he has the right to the immediate possession as against defendant. (30 Cyc. 34, par. 3.)

A suit in equity not only may, but must, be brought in the name of the beneficial owner. (*Smith v. Brittenham,* 109 Ill. 540; *Sears v. Ackerman,* 138 Cal. 583, 72 Pac. 171.)

Courts will look beyond the mere title of an action or proceeding for the purpose of determining who are interested and affected as parties. (*Van Camp v. Board of County Commrs.,* 2 Ida. 29, 2 Pac. 721.)

Where there is a substantial conflict in the evidence, the findings of the trial court will not be disturbed. (*Heckman v. Espey,* 12 Ida. 755, 88 Pac. 80.)

Nor where there is a substantial conflict in the evidence, on material issues involved. (*Robertson v. Moore,* 10 Ida. 115, 77 Pac. 218; *Deeds v. Stephens,* 10 Ida. 332, 79 Pac. 77; *Small v. Harrington,* 10 Ida. 499, 79 Pac. 461; *Spencer v. Morgan,* 10 Ida. 542, 79 Pac. 459; *Watson v. Molden,* 10 Ida. 570, 79 Pac. 503; *Abbott v. Reedy,* 9 Ida. 577, 75 Pac. 764; *Parke v. Boulware,* 9 Ida. 225, 73 Pac. 19; *Cash Hardware Co. v. Sweeney,* 9 Ida. 148, 72 Pac. 826.)

BUDGE, J.—This is an appeal from a judgment entered in the district court of the fourth judicial district in Twin Falls county, in favor of the respondents, perpetually injoining appellants from driving or maintaining an artesian well on lot 5; or from in any manner or by any means interfering with the waters flowing or which might flow from respondents' wells, which are located on lot 4, adjoining appellants' said lot; or from doing any act that would interfere with the flow or use of the water flowing from the wells of respondents.

It appears from the record that some years prior to the commencement of this action, respondents sunk several artesian wells upon lot 4, section 31, township 11 south, range 20 east, B. M. Two of these wells were dug to a depth of 360 feet, and are but a few feet apart, discharging the water flowing therefrom into a cement tank built around said wells. It further appears that before the cement tank was built, a well was dug where the tank now stands and still discharges some water underneath the tank. There is another well located about ten feet north of the cement tank and still another about 100 feet west of said tank. All of the wells outside the cement basin flow a limited amount of water and vary in depth from 110 feet to 320 feet. A measurement of all of the water flowing from respondents' wells was made prior to the bringing of this suit, and showed a combined flow of 254 inches.

Previous to the bringing of this action, the respondent Bower and his wife sold the right to the use of practically all the water flowing from said wells located upon their lands to the Artesian Water Company, a corporation, incorporated under the laws of this state—which corporation is not a party to this action. Bowers and his wife did not warrant that the flow of water from said wells would be a continuous flow of any fixed number of inches, or that said water would be furnished at all times.

Before the commencement of this action in the district court, and prior to the issuance of the injunction herein, appellants had commenced the drilling of an artesian well upon said lot 5, adjacent to the property of the respondents and within 300 feet of respondents' wells, and had reached a depth of approximately 200 feet when they were enjoined from further prosecuting said work.

There is evidence in the record to the effect that when the respondents' large well, which is located within the cement tank, was drilled, it was of sufficient size to admit an eight-inch casing down to a depth of about 85 feet, and that eight-inch casing was used to that depth, at which point it became necessary to reduce the diameter of said well to six inches, from which point a six-inch casing was continued down to the present depth of the well. Said six-inch casing was tele-scoped inside the eight-inch casing, and when the water-gate, or valve, which controls the flow of the water at the top of the pipe was placed, the same was screwed into the eight-inch casing, instead of the six-inch casing, and when this valve is closed to shut off the flow of water, the pressure forces the water down between the casings and it escapes at the bottom of the eight-inch casing, about eighty-five feet below the surface of the ground. At the time this action was brought, the appellants' well was flowing about three inches of water. When the respondents' large well within the cement tank is shut off, or partially shut off, within a few minutes thereafter the appellants' well will commence to flow an increased amount of water to the extent of twenty-five or thirty inches, and the small wells heretofore referred to, on the respond-

ents' premises and outside the cement basin, likewise increase their flow in practically the same proportion. But when the respondents' small wells, which are outside the cement basin, are shut off, it does not seem to affect the flow of water in the appellants' well; neither does it appear that the sinking of appellants' well to its present depth has in any manner affected the flow of water from respondents' smaller wells.

Appellants filed a demurrer to respondents' complaint and the same was by the trial judge overruled. We have examined the respondents' complaint and in our opinion it states a cause of action. Therefore, the court did not err in overruling appellants' demurrer.

It is next contended that the court erred in overruling a motion for nonsuit made by the appellant at the close of the introduction of respondents' evidence.

The first, third and fourth assignments of error set out in support of appellants' motion for nonsuit are, as we view the facts in this case, without merit, and we do not consider said assignments of sufficient importance to discuss them at this time, other than to say that they involve questions that will be considered and determined by this court in reaching its conclusion upon the merits of this case.

The second assignment of error urged in support of appellants' motion for nonsuit is entitled to consideration, and is as follows: "The evidence shows without conflict that the plaintiffs were not the owners of the water coming from what are called the Bowers wells, but that such water is owned by the Artesian Water Company, an Idaho corporation, and that no rights to any of the waters of said wells which plaintiffs may have, have ever been interfered with by the sinking of defendants' well." Counsel for appellants contend that the plaintiffs below, by reason of having conveyed by deed the right to the use of the waters flowing from the wells located upon plaintiffs' premises to the Artesian Water Company, a corporation, during the irrigation season and for the balance of the year such an amount only as was necessary for domestic purposes, prior to the commencement of this action

in the trial court, would not be authorized, under the law, to maintain this action against the defendants.

It appears from the record in this case that about September, 1909, the respondents, by deed, conveyed to the Artesian Water Company, a corporation, 262 inches of water flowing and to flow from the wells in question, located upon respondent's land, for use during irrigation season, and during the balance of the season such an amount of water as was necessary for domestic purposes; the grantors retaining control of the waters and the possession of the land upon which the wells are situated, and also retaining the right to control the flow of the water to the place or places of distribution to the consumers. It also appears that the respondents were virtually the owners of all of the capital stock of said Artesian Water Company, and that Bower and his wife were president and secretary, respectively, of said corporation.

Sec. 4090, Rev. Codes, provides: "Every action must be prosecuted in the name of the real party in interest, except as otherwise provided by this code." In the case of *Van Camp v. Board of County Commrs.*, 2 Ida. 29, 2 Pac. 721, this court said: " . . . . It would be the duty of the court to look beyond the mere title to ascertain who are interested and affected as parties." We think the general rule to be that "Although a legal title is necessary for a standing as plaintiff in a court of law, it does not follow that the complete legal title is necessary. Thus, any person may sue for an interference with the possession if he has the right to the immediate possession as against defendant." (30 Cyc., p. 34, par. 3.) Sec. 4105, Rev. Codes, provides that " . . . . When the question is one of a common or general interest of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all." And as said by the court in the case of *Olds v. Cummings,* 31 Ill. 188: "Courts of equity will not be confined to legal forms and legal titles, but look beyond these, to the substantial, equitable rights of parties." In the case of *Gilpin v. Sierra Nev. Con. Min. Co.,* 2 Ida. 696, 23 Pac. 547, 1014, it is said: " . . . . Nonjoinder

of parties plaintiff . . . . is not properly in issue on an application for an injunction against the acts of a stranger to the property threatened with injury.''

From the above statement of facts, and under the authorities cited, it clearly appears that the respondents were the real parties in interest, and had the right to maintain this action against the appellants for interfering with the water of said wells, the same being lawfully in their possession, although they were obligated under their deed to deliver water to the users thereof at some distant point. The respondents were entitled to the right to the use of water flowing from said wells by reason of prior appropriation, provided said water had been put to a beneficial use. Therefore, the court did not err in denying appellants' motion for a nonsuit.

The trial court in its findings of fact, among other things, found that the loss of water in respondents' well was caused directly or indirectly by the sinking of appellants' well, which was manifested by the increased flow therefrom; that the further sinking of appellants' well would endanger the supply of the water flowing from the respondents' well, in case the appellants should secure a portion of the artesian flow now coming through the respondents' well, which they could not, by gravity flow, replace in the cement tank or basin surrounding the large wells of the respondents, and that the construction of appellants' well had opened a direct channel or communication with the same artesian belt or basin tapped by the respondents. Appellants insist that the findings of the court are not supported by the evidence, and the testimony without material conflict establishes the fact that if any loss occurred in the Bower wells by the sinking of appellants' well, such loss was the fault of the respondents, by permitting a defective casing to exist in the large well; that there was no evidence to support the court's findings that the further sinking of appellants' well will endanger the supply of water flowing from respondents' well; that there is no evidence to show that the water, if obtained in appellants' well, could not be made to flow by gravity to and into the tank surrounding the respondents' well, and that the evidence utterly fails

to establish the opening up of a communication with the artesian basin tapped by the respondents.

There is a substantial conflict in the testimony involving the loss of the flow of water in the large wells of respondents within the cement tank or basin, as to whether the loss was caused by defective construction of respondents' large well, or by closing the valve at the top of the large well, thus forcing the water out of the well at the point where the eight and six-inch pipes are joined, eighty-five feet below the surface of the ground, resulting in the water percolating through the soil into the appellants' well increasing the flow; or whether the loss was occasioned by appellants' well, during the construction thereof, coming in direct contact with the underground channel, artesian belt or basin of water from which respondents' wells are supplied. This being true, under the accepted rule, ''Where there is a substantial conflict in the evidence, the findings of the trial court will not be disturbed.'' (*Heckman v. Espey*, 12 Ida. 755, 88 Pac. 80; *Hufton v. Hufton,* 25 Ida. 96, 136 Pac. 605; *Henry Gold Min. Co. v. Henry,* 25 Ida. 333, 137 Pac. 523.) When the evidence is extensive and in conflict, findings of the trial court will not be reversed on appeal. (*Commercial Trust Co. v. Idaho Brick Co.,* 25 Ida. 755, 139 Pac. 1004.)

It is now necessary to decide whether the findings of fact made by the trial court are sufficient to support the judgment, and in doing so there are three pertinent questions to be considered: First, the right of a land owner to drive a well on his own land in order to obtain subterranean waters; second, to what depth and under what conditions may a well be driven before a permanent injunction will lie at the instance of an adjoining land owner, who is a prior appropriator of subterranean waters, for an interference with the flow of water in said adjoining land owner's well; third, are subterranean waters in this state subject to appropriation for a beneficial use.

Percolating waters have been defined by the supreme court of California, in the case of *Los Angeles v. Hunter*, 156 Cal. 603, as ''vagrant, wandering drops moving by gravity in any

and every direction along the line of least resistance.'' Percolating waters have been subdivided into various classes. However, we do not deem it necessary to discuss these classes.

While the law governing the right to the use of percolating waters is new in this state, there are many decisions, both in England and in the United States, defining the common law and the various statutory enactments which govern the right to the use of percolating waters. In the case of *Broadbent v. Ramsbotham,* 11 Exch. Rep. 602, the court held: ''All the water flowing from Heaven and shed upon the surface of the hill at the foot of which a brook runs must, by the natural course of gravity, find its way to the bottom and so into the brook; but this does not prevent the owner of the land on which it falls from dealing with it as he may please and appropriating it. He cannot do so if the water has arrived at and is flowing in some definite channel.'' In the case of *Acton v. Blundell,* 12 Mees. & W. 324, the court of exchequer was of the opinion that the owner of the surface might apply subterranean water as he pleased, and that any inconvenience to his neighbor from so doing was *damnum absque injuria;* further observing ''that the existence and state of underground waters is generally unknown before a well is made; and after it is made there is the difficulty of knowing exactly how much, if any, of the water of the well, when the ground was in its natural state, belonged to the owner in right of his property in the soil, and how much belonging to his neighbor. These practical uncertainties made it very reasonable not to apply the rules which regulate the enjoyment of streams and waters above ground to subterranean waters.'' It might, however, be said that the common law of England was to the effect that percolating waters belonged to the persons owning the land, and could be used by such persons as they might please, without liability to anyone.

Percolating water has not received the attention of legislative bodies that has been given to running water in natural channels or surface water generally, for the reason that it is invisible and requires practical demonstration to determine to what extent, if any, the sinking of additional wells; the

creating of additional springs; adding to the flow of springs by opening up and removing the surface of the earth; or by reason of installing pipes or other contrivances for the purpose of overcoming natural resistance to the free flow of percolating waters, may affect the water supply.

In the case of *Acton v. Blundell, supra,* the court held that percolating water "falls within the principle which gives to the owner of the soil all that lies beneath his surface; that the land immediately below is his property, whether it be solid rock, or porous ground, or venous earth, or part soil, part water; that the person who owns the surface may dig therein, and apply all that is found to his own purposes at free will and pleasure."

Some courts have gone so far as to hold that one may purchase land in order to secure the percolating water for the purpose of furnishing a municipal water supply, and not be liable to the owners of the adjoining land, although the wells thereon be destroyed. In the case of *Huber v. Merkle,* 117 Wis. 355, 98 Am. St. 933, 94 N. W. 354, 62 L. R. A. 589— a comparatively recent case—the supreme court held in substance, that a land owner has the right to sink a well on his own land and use the water therefrom for any purpose he chooses, or even to allow it to flow away, regardless of the effect on his neighbor's wells, and that such right is not affected by malicious intent. The reason for the rule is announced in the case of *Chatfield v. Wilson,* 28 Vt. 49, as follows: "The secret, changeable, and uncontrollable character of underground water in its operations is so diverse and uncertain that we cannot well subject it to the regulations of law, nor build upon it a system of rules, as is done in the case of surface streams." In the case of *Greenleaf v. Francis,* 18 Pick. (Mass.) 117, where the lots of the plaintiff and defendant adjoined each other, the plaintiff's well was dug fourteen years prior to the time the defendant dug his well. By the digging of defendant's well the water in plaintiff's well was very materially diminished. The court held in effect that everyone has the liberty of doing in his own ground whatsoever he pleases, even though it should occasion to his neigh-

bor some other sort of inconvenience, and that the defendant having dug his well on his own ground, where it would be most convenient for him, it was the lawful act, and although it may have been prejudicial to the plaintiff, it was *damnum absque injuria;* and that the plaintiff could not recover or enjoin the defendant in the construction or use of his well. The supreme court of Georgia announced the rule in that state to be that the owner of land had no right in the water percolating beneath it, which the law recognized, and in *Warder v. Springfield,* 9 Ohio Dec. 885, it was held that percolating water was not properly within the protection of the constitution.

Under the common law of England, adopted in whole or in part as the law of this country by several of the states in the Union, confusion has resulted rather than uniform enactment of legislation controlling the right to the use of percolating waters. The supreme court of California, in the case of *Katz v. Walkinshaw,* found in 141 Cal. 116, 99 Am. St. 35, 70 Pac. 663, 74 Pac. 766, 64 L. R. A. 236, refused to follow the English rule or to recognize decisions of the state of Wisconsin and the rule of law as announced of a similar character by several other states relative to the ownership of percolating waters in California. However, in that case there were some facts which differ from the facts in the case at bar. There was also involved the further proposition, viz., whether one who has developed artesian wells within a catch or artesian basin has the right to conduct the water beyond the artesian belt or basin, and thus deprive land owners within such artesian belt or basin of the right to the use of underlying waters for beneficial purposes. That court adopted what it was pleased to term the doctrine of "reasonable use," or "correlative rights," for the purpose of affording protection to the owners of property within an artesian belt or basin, in order to encourage proper development of the lands located within such basin; holding in effect that each land owner of soil lying in a belt which became saturated with percolating water was entitled to a reasonable use thereof on his own land, notwithstanding such reasonable use inter-

fered with the water percolating in his neighbor's soil, but that he had no right to injure his neighbors by an unreasonable diversion of the waters percolating in the belt, for the purpose of sale or carriage to distant lands. In support of this doctrine, the supreme court of California relies upon the principles of law applied in the case of *Smith v. City of Brooklyn,* 18 App. Div. 340, 46 N. Y. Supp. 141, and the case of *Forebell v. City of New York,* 164 N. Y. 522, 79 Am. St. 666, 58 N. E. 644, 51 L. R. A. 695. In the former case, it appears that the city of Brooklyn, for the purpose of furnishing a municipal water supply, sunk certain wells on its own land and pumped the percolating waters therefrom, transmitting the same some distance to the city for municipal purposes, and by the use of powerful pumps, withdrew the percolating waters from lands adjoining the wells. The court said: "While it is true that the city owned the land upon which it placed its structure and all of its acts were done upon its own property, it did not, however, make the erections or do the acts . . . . for any purpose of domestic use, agriculture, mining, or manufacturing, as land was used in the cases which have arisen in this country. No one dwelt thereon or was expected to. No one used the waters thereon, nor was it expected to be used in connection therewith. The sole purpose was to subordinate the use of the land to the particular purpose of a reservoir and conduit in which to gather, store and carry water to a distant place for its benefit and profit. . . . . It was its purpose not only to take the water which might come by natural percolation upon its land, but also to use artificial means . . . . drain the adjoining land of its water. This purpose has been accomplished, and by the construction of its conduit, the sinking of its wells . . . . the whole spring level of the surrounding country has been lowered, and running streams and ponds dried up." The court held that the city was liable for damages to the adjoining land owners. This case was affirmed by the supreme court in *Merrick Water Co. v. Brooklyn,* 32 App. Div. 454, 53 N. Y. Supp. 10. In the latter case the city of New York had sunk wells on its own land, constructed machinery, pumped the percolating water

from under the surface of its own land, and transported the same some distance for municipal purposes. By this act, the percolating waters under the surface of the adjoining lands were extracted and the land owners prevented from raising crops thereon. The court said: "Before the defendant constructed its wells and pumping stations, it ascertained, at least to a business certainty, that such was the percolation and underground flow or situation of the waters in its own and plaintiff's land that it could by these wells and appliances cause or compel the water of plaintiff's land to flow into its own wells, and thus deprive plaintiff of his natural supply of underground water," thus showing that the action was intentional on the part of the city. The court below followed the case of *Smith v. City of Brooklyn, supra,* and granted a perpetual injunction against the city from operating its engine-driven wells and pumping stations on the land adjoining plaintiff's land and awarded past damages.

Where percolating water exists in a state of nature generally throughout a tract of land that has been subdivided, the ownership of which is held in different proprietors, it would seem to be an impossible rule to adopt, whereby each proprietor is given the absolute right to withdraw all of the percolating waters underneath the ground owned by each one, by the driving of wells and installing of powerful pumps, or the withdrawal of the waters in any other manner that might be possible by reason of recent inventions, and thus destroy the benefits made possible by the proper regulation of percolating waters obtained by any of the above methods, for a beneficial use; and an injunction will issue to restrain any permanent interference by an adjacent land owner with the right to the use of subterranean waters acquired by a prior appropriator. No doubt, in many instances, it can be positively demonstrated that underground waters exist in large quantities, and where that can be done, a solution of the difficulties incident to the right to the use of percolating waters might be readily arrived at. However, where there exists great uncertainty as to the amount of underground water and the damage incident to the destruction and entire loss of the flow of the same—

which is true in the case at bar—we are confronted with a problem that is not so easily solved.

The appellants are the owners in fee of an acre of land located in lot 5, section 6, township 12 south of range 20, east of Boise meridian, in Cassia county, Idaho, situated within 300 feet of the cement basin within which the large wells of the respondents are located.· This acre of land was purchased, as appears from the record, for the express purpose of constructing thereon a flowing well or wells in order to obtain water to irrigate a considerable tract of land owned by the appellants about a mile and one-quarter northeast of said lot 5. After appellants had sunk their well about 200 feet, respondents brought suit in the district court and secured an order restraining appellants from further prosecuting the work of sinking their well, alleging that in so doing the flow of water in respondents' wells was interfered with and materially lessened.

A land owner may discover by the use of modern appliances in driving wells, a flow of water sufficient in quantity to properly irrigate a considerable tract of land, and relying upon his right to the use of the water discovered and brought under his control, expend a considerable amount of money in improvements, making his homestead attractive to his neighbor by reason of advanced development of his crops, fruit trees and shrubbery. The neighbor thereupon undertakes to discover the same source of water supply, and in order to make assurance doubly sure, begins the construction of his well as close as possible to the well of the first appropriator; and in digging this well a crevasse might be opened and the entire water supply lost, or an additional water supply found, ample for the needs of both. Thus, the importance of the question, as to what extent and under what conditions a junior appropriator of subterranean water may be permitted to prospect for said subterranean water, is impressed upon us.

Sec. 3242, Rev. Codes, provides that "The right to the use of waters of rivers, streams, lakes, springs and subterranean waters may be acquired by appropriation." In the case of *Le Quime v. Chambers,* 15 Ida. 405, 98 Pac. 415, 21 L. R. A.,

N. S., 76, the court says in effect, that percolating water is subject to appropriation under our statute, and as such will be recognized and protected by the courts. Sec. 3245, Rev. Codes, provides: "As between appropriators, the first in time is the first in right." The first appropriator of water for a useful or beneficial purpose has the prior right thereto, and the right once vested, will be protected and upheld, unless abandoned. (*Malad Valley Irr. Co. v. Campbell*, 2 Ida. 411, 18 Pac. 52; *Goertson v. Barrack*, 3 Ida. 344, 29 Pac. 42; *Dunniway v. Lawson*, 6 Ida. 28, 51 Pac. 1032; *Kirk v. Bartholemew*, 3 Ida. 367, 29 Pac. 40; *Lee v. Hanford*, 21 Ida. 330, 121 Pac. 558; *Nielson v. Parker*, 19 Ida. 730, 115 Pac. 488.) Any interference with a vested right to the use of water, whether from open streams, lakes, ponds, percolating or subterranean water, would entitle the party injured to damages, and an injunction would issue perpetually restraining any such interference.

The evidence offered by the respondents in this case to establish the loss of water in their wells by reason of the construction of the appellants' well is not as clear and conclusive as we think it should be in a case of this character, in order to justify the issuance of a perpetual injunction. There is evidence in the record that establishes the theory of appellants, that the cause of the loss of the 36 miner's inches of water in the Bower wells between September 5, 1912, and November 17, 1912, was caused by capping the large Bower well and forcing the water to escape through the joint where the eight-inch pipe connects with the six-inch pipe, thus filling the ground with water which found its way into the Moorman well. This conclusion is further established by the fact that the small wells upon the Bower lands would increase their flow to approximately the same extent as appellants' well, when respondents' large well within the cement basin was shut down. Had the wells been permitted to flow freely without any obstruction and in the usual and ordinary manner, it could then easily have been determined whether there was a loss of water in the Bower wells, and if this were found to be true, it would necessarily follow that it was caused by reason of the construc-

tion of the Moorman well. The court found in finding 15, "That the loss of water sustained by the plaintiffs . . . . was . . . . caused directly or indirectly by the sinking of the defendants' said well." This finding is too indefinite and uncertain upon which to base a perpetual injunction. An injunction should not issue in a case of this character, unless the testimony is direct and positive and furnishes sufficient proof to enable the court to find the real cause of the loss of water, and that such loss must be conclusively proven to be caused by the construction of the Moorman well and from no other cause. A writ of injunction will not issue to restrain an act already done. (*Wilson v. Boise City,* 7 Ida. 69, 60 Pac. 84; 22 Cyc. 759.) An injunction should not issue to enjoin the prosecution of the work on the well to its completion, unless it was conclusively established that the construction or completion of said well would result in a permanent injury to the respondents by the loss in whole or in part of the waters flowing from the wells located upon respondents' premises. In the case of *Boise Development Co. v. Idaho etc. Bank,* 24 Ida. 36, 133 Pac. 916, this court stated in substance that to warrant a permanent injunction, there must be a showing of real or imminent danger of damage. The threatened injury must be material and actual. An injunction cannot be granted to allay the fears and apprehensions the respondents have as to what may occur in the future. It is incumbent upon respondents to show that the acts against which they ask protection are not only threatened, but will in all probability be committed to their permanent injury. Such injury must be material and actual and not fanciful, theoretical or merely possible.

If the sinking of the Moorman well to the depth that the larger Bower wells have been sunk, or to a greater depth, would not interfere with the flow of the water in the Bower wells, or if there was a loss of water in the Bower wells that could be returned without material damages to respondents' well and at the same time the Moorman well be supplied with water, the court would not be justified in preventing the completion of the Moorman well.

Finding 16 by the court is not sufficient to support the judgment wherein the court finds that "the further sinking of said well by the defendants would endanger the supply of water flowing from plaintiffs' said wells; and in case the defendants should secure a portion of the artesian flow now coming through plaintiffs' said wells, the defendants could not by gravity flow replace such water where the same is now flowing, to wit, in the cement tank or basin surrounding the two large wells of the plaintiffs . . . . that the construction of defendants' said well has opened a direct channel or communication with the same artesian belt or basin tapped by the Bowers' well situated in the tank or basin." The issuing of a perpetual injunction would not be justified, should it become necessary to destroy the cement tank or basin within which the Bower wells are situated, if no permanent loss of water was caused. The necessity for changing the method or means of diverting the water from the cement tank or basin would not, of itself, deprive a subsequent appropriator of the right to divert and use unappropriated subterranean water. While the subsequent appropriator would be liable in damages, he would have the right to divert surplus subterranean waters. (*Salt Lake City v. Gardner,* 39 Utah, 30, 114 Pac. 147.)

If the construction of appellants' well as found by the court has opened up a direct channel or communication with the same artesian belt or basin tapped by the Bower wells located in the tank, from which the same are supplied with water, the court would not be justified in issuing a perpetual injunction enjoining appellants from sinking their well, unless it was further conclusively established that by reason of the appellants' well coming in contact with the channel or artesian belt or basin, which supplied water to the Bower wells, it resulted in the permanent loss of water in the Bower wells, which water could not be replaced from the well of the appellants without permanent injury to respondents. The fact that the further sinking of appellants well would endanger the supply of water to respondents' well is not, in and of itself, sufficient to support the judgment. It must further appear that the sinking of appellants' well did not only endanger the loss of water in

respondents' well, but that said loss would be actual and permanent and the water so lost could not be returned to respondents' irrigating system from the well of appellants. Should the flow of water in respondents' well be lessened by reason of the sinking of appellants' well, or should the inability of appellants to return to the irrigating system of respondents any loss in the water supply from the wells of respondents be established, the damages thus sustained could be speedily remedied by an order of the court directing that the well of appellants be permanently plugged or closed.

In our opinion the findings do not support the judgment. Therefore, in view of the conclusions reached by this court, it will be necessary to remand this case to the trial court with directions to suspend the perpetual injunction heretofore entered, and allow appellants to continue the sinking of the well situated upon said lot five, until it is conclusively established that respondents' well will sustain a permanent loss in the supply of water by reason of the construction or final completion of appellants' well; and that said loss of water cannot be returned to the diversion works of the respondents from the well of the appellants without material and permanent damage to the diversion works, and a surplus flow of water obtained for the use and benefit of the appellants. Should it later appear to the trial court that the flow of water in respondents' well is actually diminished by reason of the construction of appellants' well, and that said flow cannot be supplied from the well of the appellants, whereby respondents will suffer the permanent loss of the water heretofore appropriated and put to a beneficial use by them, said injunction should be restored and the well of the appellants permanently closed.

Each party to this suit shall pay its own costs.

Sullivan, C. J., and Morgan, J., concur.